**Office of Disciplinary Counsel v. Abrams**

Disciplinary Board Docket, no. 153 D.B. 2000.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

SCHULTZ, *Member,* November 7, 2002—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On November 28, 2000, petitioner, Office of Disciplinary Counsel, filed a petition for discipline against respondent, Ronald B. Abrams, alleging that respondent engaged in certain professional misconduct, thereby violating Pennsylvania Rules of Professional Conduct 1.15(a), 1.15(b) and 8.4(c). Respondent filed an answer to the petition for discipline on December 29, 2000.

Disciplinary hearings were held on both April 24, 2001 and June 18, 2001 before Hearing Committee 1.09 comprised of Chair Denise Joy Smyler, Esquire and Members Thomas G. Wilkinson Jr., Esquire and Jerry Michael Lehocky, Esquire. Petitioner was represented by Barbara

S. Rosenberg, Esquire. Respondent was represented by Samuel C. Stretton, Esquire. Petitioner submitted a stipulation of facts as well as nine exhibits and presented no witnesses. Respondent submitted a supplemental stipulation of facts as well as over 40 exhibits and presented the testimony of his accountant, his financial advisor, his treating psychiatrist, a psychiatric expert and various character witnesses, as well as his own testimony.

The Hearing Committee filed a report on January 29, 2002 recommending an 18-month suspension. A brief on exceptions was filed by petitioner. Respondent filed a brief opposing exceptions and requested oral argument. Oral argument was heard on May 6, 2001 by a panel consisting of Board Members Mark C. Schultz, Esquire, John W. Morris, Esquire, and Lisa A. Watkins, Esquire.

This matter was adjudicated by the Disciplinary Board at its meeting on May 15, 2002.

## II. FINDINGS OF FACT

The board makes the following findings of facts:

(1) Respondent was born in 1944 and was admitted to practice law in the Commonwealth of Pennsylvania in 1970.

(2) For most of his years in practice, respondent maintained a very busy plaintiff's personal injury practice.

(3) At various times during the period from 1995 through 1998, respondent held fiduciary funds in the following bank accounts:

(a) Midlantic Bank account no. 000-517206-9, titled "Ronald B. Abrams Esq. escrow account";

(b) Midlantic Bank account no. 84-0030-5993, titled "Ronald B. Abrams Esq. escrow account";

(c) PNC Bank account no. 84-0030-5993, titled "Ronald B. Abrams Esq. escrow acct";

(d) PNC Bank account no. 86-01916272, titled "Ronald B. Abrams IOLTA," 5/12/98-present;

(e) Midlantic Bank account no. 000-4278040, titled "Ronald B. Abrams, Attorney," which became:

(f) PNC Bank account no. 84-0025-5631, titled "Ronald B. Abrams, Attorney";

(g) Jefferson Bank account no. 0510-17334, titled "Ronald B. Abrams Esq.," 9/96-3/98;

(h) United Valley Bank account no. 032-03336, titled "Ronald B. Abrams Esquire IOLTA account";

(i) Jefferson Bank account no. 0022-13303, titled "Ronald B. Abrams Esquire";

(j) First Executive Bank account no. 104 982 8, captioned "Ronald B. Abrams, Esq. escrow account"; and

(k) United Valley Bank account no. 002-13303, titled "Ronald B. Abrams Esquire."

(4) During a period commencing in 1995 and continuing to late 1998, respondent engaged in a pattern of misconduct involving funds of clients and third persons in his possession in connection with a representation (fiduciary funds), wherein he:

(a) failed to hold all fiduciary funds in a bank account separate from his own funds, deposited personal funds

into an account used as an escrow account, and distributed fiduciary funds from that account;

(b) failed to promptly distribute to clients and third parties funds to which they were entitled, and in some cases never made such distribution, as set forth in paragraph 12;

(c) issued checks for fiduciary obligations which were not supported by sufficient funds;

(d) utilized fiduciary funds for his own benefit, without the knowledge and consent of the parties entitled to the funds; and

(e) failed to maintain sufficient funds in the account(s) into which he deposited fiduciary funds to meet all fiduciary entrustments.

(5) During the following periods, respondent failed to hold sufficient funds in said accounts to support all fiduciary entrustments:

| ESCROW ONLY | DAYS | COMBINED BALANCE ALL ACCOUNTS | DAYS |
|---|---|---|---|
| 3/29/95-4/7/95 | 10 | 4/4/95-4/7/95 | 4 |
| 4/12/95-5/23/95 | 41 | 4/17/95-5/23/95 | 37 |
| 6/16/95-7/6/95 | 21 | 6/19/95-6/27/95 | 9 |
| | | 6/29/95-7/6/95 | 8 |
| 8/18/95-8/20/95 | 3 | | |
| 10/18/95-10/20/95 | 3 | | |
| 10/31/95-12/5/95 | 35 | 11/9/95-12/5/95 | 26 |
| 12/7/95-12/31/95 | 25 | 12/7/94-12/31/95 | 25 |
| TOTAL FOR YEAR 1995 | 138 | | 109 |

| | | | |
|---|---:|---|---:|
| 1/1/96-5/13/96 | 133 | 1/1/96-3/15/96 | 75 |
| | | 3/21/96-5/13/96 | 53 |
| 5/17/96-5/30/96 | 13 | 5/23/96-5/30/96 | 8 |
| 6/10/96-6/21/96 | 12 | 6/11/96-6/21/96 | 11 |
| 7/1/96-12/31/96 | 184 | 7/1/96-12/2/96 | 155 |
| | | 12/11/96-12/27/96 | 17 |
| *TOTAL FOR YEAR 1996* | *342* | | *319* |
| 1/1/97-5/7/97 | 127 | 1/3/97-1/6/97 | 4 |
| | | 1/16/97-2/3/97 | 19 |
| | | 2/14/97-5/7/97 | 73 |
| 5/19/97-10/27/97 | 161 | 5/19/97-10/27/97 | 161 |
| 11/21/97-12/31/97 | 40 | 11/24/97-12/31/97 | 38 |
| *TOTAL FOR YEAR 1997* | *328* | | *305* |
| 1/1/98-1/23/98 | 23 | 1/1/98-1/23/98 | 23 |
| 2/2/98-2/13/98 | 8 | 2/9/98-2/12/98 | 5 |
| *TOTAL THROUGH 6/30/98* | *31* | | *28* |

(6) The negative cumulative account status reached as high as $65,676.74 during this period.

(7) Distributions took place as follows in the following matters:

| | | | | |
|---|---:|---|---|---|
| (a) John Brownlee | $6,948 | 1/19/95 | - | 1/23/95 |
| | 958 | | - | 2/15/95 |
| | 633 | | - | 3/21/95 |
| | 233 | | - | 3/28/95 |
| | 0 | | - | 3/28/96 |
| | Lapse: | 69 days | | |
| | | | | |
| (b) G. Nichol Est. | $35,852 | 2/10/95 | - | 2/24/95 |
| | 6,641 | | - | 6/20/95 |
| | 6,337 | | - | 6/21/95 |
| | 3,787 | | - | 6/26/95 |
| | 3,723 | | - | 7/5/95 |

|  | 2,728 |  | - 11/12/96 |
|  | 0 |  | - 11/13/96 |
|  | Lapse: | 277 days |  |
| (c) Derrick Snowten | $7,640 | 4/10/95 | - 5/2/95 |
|  | 2,352 |  | - 5/4/95 |
|  | 399 |  | - 5/15/95 |
|  | 231 |  |  |
|  | Lapse: | 35 days |  |
| (d) Linda Carroll | $7,442 | 4/10/95 | - 5/25/95 |
|  | 2,309 |  | - 6/20/95 |
|  | 1,841 |  | - 6/23/95 |
|  | 168 |  | - 6/26/95 |
|  | 0 |  | - 6/27/95 |
|  | Lapse: | 77 days |  |
| (e) Ivan Ortiz | $5,480 | 5/4/95 | - 5/15/95 |
|  | 1,885 |  | - 5/31/95 |
|  | 950 |  | - 7/5/95 |
|  | 0 |  | - 7/6/95 |
|  | Lapse: | 62 days |  |
| (f) Beulah Nelson | $56,545 | 5/24/95 | - 6/12/95 |
|  | 6,342 |  | - 6/23/95 |
|  | 5,694 |  | - 6/26/95 |
|  | 2,641 |  | - 6/30/95 |
|  | 2,326 |  | - 7/10/95 |
|  | 1,510 |  | - 7/31/95 |
|  | 0 |  | - 8/1/95 |
|  | Lapse: | 69 days |  |
| (g) Crystal Hill | $5,830 | 7/7/95 | - 7/12/95 |
|  | 1,294 |  | - 8/11/95 |
|  | 0 |  | - 8/14/95 |
|  | Lapse: | 38 days |  |

| (h) Roosevelt Brant | $32,997 | 7/17/95 | - | 7/24/95 |
|---|---|---|---|---|
| | 31,497 | | - | 8/7/95 |
| | 23,497 | | - | 8/25/95 |
| | 15,000 | | - | 9/14/95 |
| | 10,000 | | - | 11/20/95 |
| | 8,000 | | - | 1/22/96 |
| | 4,000 | | - | 3/18/96 |
| | 0 | | - | 3/19/96 |
| | Lapse: | 245 days | | |
| | | | | |
| (i) Eul Kim | $1,310 | 8/16/95 | - | 9/27/95 |
| | 0 | | - | 9/28/95 |
| | Lapse: | 43 days | | |
| | | | | |
| (j) Bok Ram Cho | $3,310 | 8/16/95 | - | 9/27/95 |
| | 0 | | - | 9/28/95 |
| | Lapse: | 43 days | | |
| | | | | |
| (k) Jong Sun Kim | $6,900 | 10/16/95 | - | 11/13/95 |
| | 6,000 | | - | 2/2/96 |
| | 2,750 | | - | 3/1/96 |
| | 2,575 | | - | 3/25/96 |
| | 2,075 | | - | 7/15/96 |
| | 2,000 | | - | 10/19/00 |
| | 0 | | - | 10/17/00 |
| | Lapse: | 4 years + 2 days | | |
| | | | | |
| (l) Dawn Young | $4,834 | 10/24/95 | - | 10/25/95 |
| | 2,314 | | - | 7/2/96 |
| | 1,772 | | - | 7/3/96 |
| | 1,036 | | - | 7/5/96 |
| | 735 | | - | 7/12/96 |
| | 472 | | - | 8/2/96 |
| | 360 | | - | 11/20/96 |
| | 0 | | - | 11/21/96 |
| | Lapse: | 1 year + 29 days | | |

(m) Ella Honore

| | | | |
|---|---|---|---|
| $13,653 | 10/24/95 | - | 2/1/96 |
| 3,102 | | - | 4/1/96 |
| 1,656 | | - | 4/5/96 |
| 990 | | - | 5/28/96 |
| 120 | | - | 6/3/96 |
| 0 | | - | 6/5/96 |
| Lapse: | 225 days | | |

(n) Geraldine Carr

| | | | |
|---|---|---|---|
| $20,210 | 11/21/95 | - | 12/11/95 |
| 18,210 | | - | 1/25/96 |
| 14,210 | | - | 2/2/96 |
| 6,747 | | - | 2/12/96 |
| 6,373 | | - | 2/29/96 |
| 2,668 | | - | 3/1/96 |
| 906 | | - | 3/16/96 |
| 0 | | - | 3/19/00 |
| Lapse: | 118 days | | |

(o) Nyasa Monk

| | | | |
|---|---|---|---|
| $20,678 | 12/7/95 | - | 1/2/96 |
| 19,028 | | - | 1/19/96 |
| 18,498 | | - | 2/20/96 |
| 0 | | - | 2/21/96 |
| Lapse: | 76 days | | |

(p) Dana Williams

| | | | |
|---|---|---|---|
| $500 | 12/22/95 | - | 5/15/00 |
| 0 | | - | 5/16/00 |
| Lapse: 4 years + 147 days | | | |

(q) Alma Young

| | | | |
|---|---|---|---|
| $24,447 | 1/22/96 | - | 3/29/96 |
| 7,683 | | - | 4/10/96 |
| 7,013 | | - | 4/15/96 |
| 4,531 | | - | 4/17/96 |
| 2,383 | | - | 4/22/96 |
| 1,588 | | - | 4/23/96 |
| 475 | | - | 5/13/96 |
| 0 | | - | 5/14/96 |
| Lapse: | 113 days | | |

428

| | | | |
|---|---|---|---|
| (r) Ill Ho Kim | $24,288 | 2/13/96 | - 2/27/96 |
| | 9,834 | | - 3/20/96 |
| | 9,134 | | - 4/2/96 |
| | 0 | | - 4/3/96 |
| | Lapse: | 41 days | |

| | | | |
|---|---|---|---|
| (s) Ronald Graves | $22,897 | 3/18/96 | - 3/18/96 |
| | 14,598 | | - 3/28/96 |
| | 7,598 | | - 4/19/96 |
| | 5,598 | | - 4/22/96 |
| | 1,086 | | - 6/17/96 |
| | 0 | | - 6/18/96 |
| | Lapse: | 92 days | |

| | | | |
|---|---|---|---|
| (t) Jamal Jones | $31,075 | 6/24/96 | - 2/3/98 |
| | 25,190 | | - 2/13/96 |
| | 2,995 | | - 3/20/96 |
| | 0 | | - 3/23/96 |
| | Lapse: | 1 year + 273 days | |

| | | | |
|---|---|---|---|
| (u) Sook Ja Lee | $4,997 | 7/17/96 | - 11/12/96 |
| | 0 | | - 11/13/97 |
| | Lapse: | 119 days | |

| | | | |
|---|---|---|---|
| (v) Jong Da Lee | $1,397 | 7/17/96 | - 11/12/96 |
| | 0 | | - 11/13/96 |
| | Lapse: | 119 days | |

| | | | |
|---|---|---|---|
| (w) B. Lanier | $1,535 | 8/12/96 | - 8/19/96 |
| | 735 | | - 9/17/96 |
| | Lapse: | 39 days | |

| | | | |
|---|---|---|---|
| (x) B. Graham | $900 | 8/20/96 | - 11/12/96 |
| | 0 | | - 11/13/00 |
| | Lapse: | 85 days | |

| | | | |
|---|---|---|---|
| (y) Misook Lee | $5,250 | 9/30/96 | - 10/22/96 |
| | 2,065 | | - 11/20/96 |
| | 420 | | - _____ |
| (z) Pyong Hong | $4,960 | 10/10/96 | - 12/19/96 |
| | Lapse: | 70 days | |
| (aa) Rose Williams | $7,331 | 10/29/96 | - 12/3/96 |
| | Lapse: | 35 days | |
| (bb) Evelyn Williams | $6,134 | 10/29/96 | - 12/3/96 |
| | Lapse: | 35 days | |
| (cc) Lisa Cohen | $8,949 | 11/20/96 | - 12/9/96 |
| | 2,056 | | - 12/26/96 |
| | 1,056 | | - 1/5/97 |
| | 540 | | - 1/10/97 |
| | 0 | | - 1/13/97 |
| | Lapse: | 54 days | |
| (dd) Janina Gawronski | $16,008 | 1/6/97 | - 2/3/97 |
| | 482 | | - 3/5/97 |
| | 0 | | - 3/6/97 |
| | Lapse: | 60 days | |
| (ee) Hun Chul Young | $7,500 | 3/3/97 | - 4/23/97 |
| | 258 | | - 5/30/97 |
| | 0 | | - 6/2/97 |
| | Lapse: | 100 days | |
| (ff) Vivian Simmons | $518 | 3/13/97 | - 4/7/97 |
| | 29,974 | | - 5/9/97 |
| | 27,974 | | - 5/23/97 |
| | 26,139 | | - 5/28/97 |
| | 25,927 | | - 5/29/97 |

430

|  |  |  |  |  |
|---|---|---|---|---|
|  | 22,697 |  | - | 5/30/97 |
|  | 22,587 |  | - | 6/2/97 |
|  | 784 |  | - | 6/5/97 |
|  | 0 |  | - | 6/6/97 |
|  | Lapse: | 85 days |  |  |
|  |  |  |  |  |
| (gg) Maureen Clifford | $14,407 | 4/2/97 | - | 5/8/97 |
|  | 3,618 |  | - | 5/29/97 |
|  | 148 |  | - | 6/5/97 |
|  | 0 |  | - | 6/6/97 |
|  | Lapse: | 65 days |  |  |
|  |  |  |  |  |
| (hh) Gwang Yi | $4,312 | 4/30/97 | - | 7/24/97 |
|  | 0 |  | - | 7/25/97 |
|  | Lapse: | 86 days |  |  |
|  |  |  |  |  |
| (ii) Jung Yi | $4,995 | 4/30/97 | - | 7/24/97 |
|  | 0 |  | - | 7/25/97 |
|  | Lapse: | 86 days |  |  |
|  |  |  |  |  |
| (jj) Viola Porter | $76,884 | 5/8/97 | - | 6/23/97 |
|  | 0 |  | - | 6/24/97 |
|  | Lapse: | 47 days |  |  |
|  |  |  |  |  |
| (kk) Valeria Henry | $4,150 | 6/13/97 | - | 8/18/97 |
|  | 675 |  | - | 8/22/97 |
|  | 445 |  | - | 8/26/97 |
|  | 0 |  | - | 8/27/97 |
|  | Lapse: | 75 days |  |  |
|  |  |  |  |  |
| (ll) Rosita Warburton | $5,043 | 7/24/97 | - | 7/31/97 |
|  | 2,000 |  | - | 3/12/98 |
|  | 0 |  | - | 3/13/98 |
|  | Lapse: | 232 days |  |  |

| | | | |
|---|---|---|---|
| (mm) Marie LeCoin | $9,828 | 9/17/97 | - 9/23/97 |
| | 1,670 | | - 10/21/97 |
| | 1,385 | | - 11/28/97 |
| | 1,008 | | - 12/2/97 |
| | 800 | | - _____ |
| | | | |
| (nn) Elizabeth Olszewski | $5,431 | 10/6/97 | - 12/1/97 |
| | 1,224 | | - 12/4/97 |
| | 1,075 | | - 12/8/97 |
| | 170 | | - 3/23/98 |
| | 0 | | - 3/25/98 |
| | Lapse: | 140 days | |
| | | | |
| (oo) Sung Hyum Lim | $14,675 | 10/28/97 | - 12/19/97 |
| | 2,926 | | - 1/5/98 |
| | 0 | | - 1/6/98 |
| | Lapse: | 70 days | |
| | | | |
| (pp) Joseph Mulvey | $63,093 | 10/28/97 | - 11/14/97 |
| | 13,093 | | - 3/31/98 |
| | 12,733 | | - 4/2/98 |
| | 0 | | - 4/3/98 |
| | Lapse: | 187 days | |
| | | | |
| (qq) Lawrence Carola | $40,648 | 10/28/97 | - 11/24/97 |
| | 8,649 | | - 3/31/98 |
| | 1,273 | | - 4/2/98 |
| | 0 | | - 4/3/98 |
| | Lapse: | 187 days | |
| | | | |
| (rr) Soon Hak Yoon | $2,347 | 12/1/97 | - 5/19/98 |
| | 3,213 | | - 7/22/98 |
| | Lapse: | 233 days | |
| | | | |
| (ss) Mary Eldridge | $14,710 | 12/12/97 | - 12/22/97 |
| | 10,976 | | - 1/6/98 |

| | | | |
|---|---|---|---|
| | 6,976 | - | 1/9/98 |
| | 6,116 | - | 1/15/98 |
| | 0 | - | 1/16/00 |
| | Lapse: | 35 days | |
| (tt) Arlene Sealy | $8,183 | 2/27/98 - | 3/2/98 |
| | 2,496 | - | 3/12/98 |
| | 1,871 | - | 3/25/98 |
| | 1,761 | - | 4/21/98 |
| | 84 | - | _____ |

(8) In most of the aforementioned matters, the delay in not distributing to clients those portions of the settlement proceeds held by respondent was for the purpose of paying and/or negotiating the bills of third-party medical care providers and/or liens of insurance carriers. (N.T. II 176-93.)

(9) In negotiating some of these bills and/or liens, resolution could not be reached and litigation arose. In one such case, the Brant matter, judgment for the medical care provider was entered in an amount in excess of the amount escrowed by respondent, so respondent had to pay the additional monies out of his own pocket. (N.T. II 180-82.)

(10) Respondent was named executor of the estate of his father, Jacob Abrams, who died in July 1988.

(11) The assets of the estate poured over into a trust of which respondent was the trustee until 1999 (Abrams trust). The income beneficiary was respondent's mother, Regina Abrams, and the residuary beneficiaries were respondent and his two sisters, Elaine Abrams and Janice Squares Weiner. At all times relevant hereto, the Abrams trust was with the Fidelity Investment Company.

(12) Respondent also held a durable power of attorney jointly with his sister Elaine Abrams, for his mother, who became mentally incapacitated sometime in the mid-1990s.

(13) In October 1992 and on various occasions between April 1995 and October 1997, respondent withdrew funds from the Abrams trust, as set forth in paragraph 15 below, as loans for his own benefit, without the knowledge and consent of the trust beneficiaries.

(14) Additionally, on two occasions Fidelity Investment Company withdrew funds from the trust and deposited the funds to respondent's individual account, as follows:

| | |
|---|---|
| 4/13/95 | $26,840.26 |
| 11/10/95 | $27,711.12 |

These funds have been repaid to the trust as reflected in paragraph 15.

(15) The dates and amounts of the loans and payments follow:

| DATE | AMOUNT INTEREST RATE (Per respondent) | DATE PAID | AMOUNT | |
|---|---|---|---|---|
| a. 10/28/92 | $40,255.58 | | | |
| | 6% | 11/31/92 | $40,255.58 | P |
| | 6% | 8/14/95 | $  625.00 | I |
| | | | for a and b | |
| b.  4/10/95 | $10,000 | | | |
| | 6% | 4/26/95 | $    200.00 | P |
| | | 8/14/95 | $ 9,800.00 | I |

c.  2/23/96     $12,000.00

           8% to 8/1/97     11/18/96     $ 3,000.00  P
           6% after 8/1/97    7/28/97      $ 2,320.00  I
                                              for c, e-h

d.  9/5/96     $2,000.00

           8% to 7/27/97
           6% after 7/27/97

e.  9/11/96     $33,609.00
           5% to 5/20/98    5/20/98     $ 3,300.00  I

           6% after 5/20/98  10/5/98     $20,000.00  P

f.  2/5/97     $28,000.00

           8% to 8/1/97     3/31/97     $ 4,000.00  P
           6% after 8/1/97    7/28/97      $ 7,000.00  P

g.  7/21/97     $15,000.00
           6%

h.  7/28/97     $27,000.00
           6%

i.  10/3/97     $10,000.00
           6%               12/1/97     $ 170.00  I
                         12/1/97     $10,000.00  P
                         6/30/98     $ 2,100.00  I

       Additional payments:

                         12/18/98    $ 6,891.00  I
                         4/6/99      $ 7,253.00  I
                                     $ 1,037.00  P
                         7/8/99      $50,000.00  P
                         8/3/99      $40,000.00  P
                         8/13/99     $47,123.00  P

Total withdrawn
    by respondent$   177,864.58
    by Fidelity   $   54,551.38

    Total         $ 232,415.96

Total paid      Principal         $232,415.96
               interest          $ 34,884.00
                               $267,299.58

(16) Respondent deposited the funds converted from the trust into the PNC attorney account and utilized the funds to pay outstanding fiduciary obligations.

(17) For most of these transactions, respondent failed to execute contemporaneous promissory notes setting forth his obligations to the trust.

(18) Respondent failed to account contemporaneously and promptly to the remaining beneficiaries for the transactions in the trust.

(19) Respondent failed to pay timely, adequate, and regular interest on the withdrawn funds and to repay the full amount of principal to the trust until August 1999, at which time restitution was completed.

(20) In June 1998, after having received notice of petitioner's investigation into his handling of a client's funds, respondent confessed to one of his sisters, Elaine Abrams, that he had been taking money from the trust. (N.T. I 52.)

(21) If called to testify in this matter, Janice Squires Weiner, respondent's other sister, would testify:

(a) In or about August 1998, after having received notice of petitioner's investigation into his handling of the Abrams trust, respondent advised Ms. Weiner that he was being investigated by "the Bar Association" because of more than $100,000 he had withdrawn from the trust.

(b) Respondent stated that it would help him if she were satisfied so long as the funds were returned to the trust.

(c) Ms. Weiner said she needed to think about this and asked to see everything which respondent had provided to "the Bar Association."

(22) In September 1998, respondent provided to petitioner and to his sisters documents relating to the trust, including, inter alia:

(a) Promissory note to himself as trustee under the will, dated July 28, 1997, in the amount of $70,000, at an interest rate of six percent, to be paid within two years, with no additional payment terms; and

(b) Promissory note to himself as trustee under the will, dated August 19, 1998, in the amount of $33,609, at an interest rate of six percent, to be paid within two years, with no additional payment terms.

(23) In or about September 1998, after reviewing the documentation provided by respondent evidencing trust withdrawals in excess of $100,000, Ms. Weiner retained counsel, Hepburn Willcox Hamilton & Putnam LLP to pursue an accounting of and restitution to the trust.

(24) Between September 1998 and August 1999, counsel from Hepburn Willcox negotiated with respondent to secure an accounting of the trust and restitution of the trust funds, and respondent cooperated therewith.

(25) In or about August 1999, respondent resigned as trustee of the Abrams trust in favor of his sisters and completed restitution to the trust as set forth in paragraph 15 above.

(26) The trust paid Hepburn Willcox counsel fees in the amount of $15,000 for their services as set forth in paragraph 24 above.

(27) Respondent has a history of treatment for depression since 1988.

(28) In 1989, respondent came under the care of his current treating psychiatrist, Dr. Thomas Benfield, for his depression.

(29) During the period from January 1995 to January 1998, Dr. Benfield's ongoing diagnosis was chronic and recurrent major depression. (N.T. I 264.)

(30) Dr. Benfield's treatment notes reflect that from 1989 to early 1998, Dr. Benfield questioned the possibility that respondent was suffering from Bipolar Type II illness. However, he did not definitely make this diagnosis until March 1998.

(31) At the hearing, Dr. Benfield explained that bipolar illness is an affective illness involving depression dispersed with periods of mania (Type I) or hypomania (Type II). Hypomania is an elevated mood involving increased confidence and risk-taking which in turn affects judgment. (N.T. I 190-92.)

(32) At the hearing, Dr. Benfield expressed the opinion that during the period of respondent's misconduct from 1995 to 1998, he was suffering with Bipolar Type II illness which affected his judgment such that "he may have made or done things" that he would not do now. (N.T. I 201-202.) Dr. Benfield further stated that he believed that respondent's mental disorder had a causal

relationship with his mishandling of the funds (N.T. I 259.)

(33) At the hearing, Dr. Benfield testified that respondent is currently under treatment and on lithium, and that his prognosis is very good. (N.T. I 204.)

(34) The Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) lists symptoms of hypomania as an abnormally and persistently elevated expansive or irritable mood that lasts for at least four days; inflated self-esteem or grandiosity; decreased need for sleep; being more talkative or the pressure to keep talking; flight of ideas or the subjective experience that thoughts are racing; distractibility or having attention being too easily drawn to unimportant or irrelevant external stimuli; psychomotor agitation or an increase in goal-directed activities such as social, sexual or occupational; and excessive involvement in pleasurable activities that have a high potential for painful consequences. (N.T. I 207-11.)

(35) DSM-IV lists the criteria for diagnosing hypomania as follows: the disturbance in mood and the change in functioning are observable by others; the episode is associated with an unequivocal change in functioning that is uncharacteristic of the person when not symptomatic; the episode is not severe enough to cause marked impairment in social or occupational functioning or to necessitate hospitalization as there are no psychotic features; and substance abuse is not involved or contributing to the episode. (N.T. I 211-12.)

(36) At the hearing, Dr. Benfield conceded that during the period of respondent's misconduct from 1995 to 1998,

he treated respondent "very infrequently" (N.T. I 193), but on the occasions when he did see respondent, respondent did not exhibit any of the symptoms of hypomania. (N.T. I 227, 241-42.)

(37) Most of respondent's character witnesses testified that they did not observe any emotional instability or inappropriateness on respondent's part during the period of his misconduct. (N.T. I 82, 89, 123, 136 and 141.)

(38) At the hearing, respondent's psychiatric expert, Dr. Robert Sadoff, testified that he had been retained by counsel for respondent to serve as an expert in this matter, and as such, Dr. Sadoff met with respondent in December 1998 for two hours and again in February 2001 for 75 minutes. (N.T. I 301-303.)

(39) At the hearing, Dr. Sadoff opined that at the time of his misconduct, respondent was hypomanic and his hypomania was a substantial factor in his misconduct. (N.T. I 315, 318-19.)

(40) Dr. Sadoff is a forensic psychiatrist who has written a book, "Forensic Psychiatry," which outlines the procedures a psychiatrist should follow before rendering an expert opinion, such as interviewing the individual; conducting a mental status exam; reviewing all relevant records, reports, and test results; and interviewing relevant family members and friends. (N.T. I 320-30).

(41) At the hearing, Dr Sadoff conceded that while he interviewed respondent and conducted a mental status exam on respondent and he reviewed Dr. Benfield's sum-

mary report and petitioner's D.B.-7 letters, he did not review Dr. Benfield's treatment notes or blood test results and he did not interview any family members or friends. (N.T. I 323-34.)

(42) Respondent has distributed or is currently in the process of distributing to clients all remaining portions of settlement proceeds held by respondent.

(43) Respondent has made full restitution to the Abrams trust, including interest.

(44) Respondent was remorseful.

(45) Respondent has no record of prior discipline.

## III. CONCLUSIONS OF LAW

By his conduct as set forth above, respondent violated the following Pennsylvania Rules of Professional Conduct:

(1) R.P.C. 1.15(a)—A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

(2) R.P.C. 1.15(b)—Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(3) R.P.C. 8.4(c)—It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

## IV. DISCUSSION

This matter is before the Disciplinary Board on a petition for discipline charging respondent with the commingling and conversion of client funds and the delayed distribution of those funds to clients and third parties as well as the misappropriation and conversion of funds in a family trust, of which respondent was the trustee. Respondent cooperated with petitioner and entered into joint stipulations of facts admitting to professional misconduct and violation of R.P.C. 1.15(a) and 1.15(b). Respondent raises two arguments in his defense: first, that his misconduct does not rise to the level of a violation of R.P.C. 8.4(c), and second, that due to a psychiatric condition, he is entitled to mitigation pursuant to *Office of Disciplinary Counsel v. Braun,* 520 Pa. 157, 553 A.2d 894 (1989).

With regard to the first issue as to whether respondent violated R.P.C. 8.4(c), respondent argues that there must be evidence of criminal intent in order to prove this violation and that petitioner failed to present such evidence. R.P.C. 8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Nowhere in this rule is there required proof of criminal intent to establish a violation of same. Further, Pennsylvania's disciplinary case law does not mandate such a standard of proof. To

the contrary, the precedent is clear that a demonstration of a pattern of using fiduciary funds for personal use is sufficient to establish a violation of R.P.C. 8.4(c). See *Office of Disciplinary Counsel v. Monsour,* 549 Pa. 482, 701 A.2d 556 (1997) and *In re Anonymous No. 62 D.B. 97,* 47 D.&C.4th 1 (1999).

In the instant case, the evidence is replete and respondent admits that, during the period from 1995 to 1998, he engaged in a pattern of dishonest conduct and misrepresentation relative to fiduciary funds. With regard to client funds, he used same for his own benefit; he failed to at all times segregate such funds from his own; he failed to make prompt distribution of such funds to clients and/or third parties; and he failed to at all times maintain adequate balances in his trust accounts. With regard to the Abrams trust, of which he was the trustee, respondent withdrew funds for his own benefit without notifying the other beneficiaries of his action or preparing the appropriate documents reflecting the withdrawal and repayment of these funds.

Next, with regard to the issue as to whether respondent is entitled to *Braun* mitigation, respondent argues that the evidence presented by his two medical experts overwhelmingly established that respondent suffered from hypomania, a psychiatric disorder, at the time of his misconduct and that this hypomania was a causal factor in his misconduct. The standard for mitigation, as set forth in *Office of Disciplinary Counsel v. Braun,* requires that respondent must establish the existence of a causal connection between the psychiatric condi-

tion and the misconduct by clear and convincing evidence and by the introduction of expert testimony. Some factors to consider in analyzing the sufficiency of the expert testimony are: does the expert provide a detailed case history of respondent; is the expert fully apprised of the details of the ethical misconduct; does the expert analyze respondent's condition in the context of the misconduct; and does the expert's treatment and prognosis include an opinion on the probability of the misconduct occurring in the future. See *In re Anonymous No. 104 D.B. 95,* no. 126 Disciplinary docket no. 3 (Pa. May 21, 1997). The expert's testimony must be credible, persuasive and unequivocal. *In re Anonymous No. 66 D.B. 96,* no. 384 Disciplinary docket no. 3 (Pa. Feb. 10, 1998).

In the instant case, the testimony of both medical experts was not credible and persuasive. Dr. Benfield's treatment notes are inconsistent with his expert opinion. Specifically, none of his notes reference any of the symptoms of hypomania or the criteria for diagnosing hypomania. While respondent did have a problem sleeping, this was a problem noted throughout the entire course of treatment and not just during the relevant time period from 1995 to 1998. Further, respondent was taking daily doses of No-Doz, a caffeine supplement, while on anti-depressant medication and against the medical advice of Dr. Benfield. Also, Dr. Benfield could not cite any examples of risk-taking behavior by respondent. In addition, Dr. Benfield infrequently saw respondent during the relevant time period from 1995 to 1998, a fact which renders his opinion even more incredible and unpersuasive. Next,

in considering the above factors for analyzing the sufficiency of the expert opinion, Dr. Benfield was not fully apprised of the details of respondent's misconduct until the fall of 1998, after his diagnosis of hypomania. (N.T. I 227.) Finally, Dr. Benfield's expert opinion that respondent's illness affected his judgment such that "he may have made or done things" that he would not do is equivocal at best and does not meet the standard of proof required of *Braun* and its progeny.

Dr. Sadoff's expert opinion is equally rejected. In considering the above factors for analyzing the sufficiency of the expert opinion, Dr. Sadoff did not have a detailed case history of respondent. Before rendering his expert opinion, he only interviewed respondent on two occasions, conducted a brief mental status exam of respondent, and reviewed Dr. Benfield's report and two of petitioner's D.B.-7 letters. He did not review Dr. Benfield's treatment notes; he did not review blood test results, which he conceded he would have wanted to see (N.T. I 323); and he did not interview any family members and friends, which he conceded is one of the evaluative tools he recommends in his textbook "Forensic Psychiatry" to be used before rendering an opinion. Thus, Dr. Sadoff's opinion is based on limited and incomplete information which renders it unpersuasive. Finally, while Dr. Sadoff rendered an opinion on respondent's need for future treatment, he failed to opine as to respondent's future prognosis and the probability of misconduct occurring in the future. (N.T. I 317.)

As the foregoing demonstrates, the board finds that respondent's expert evidence was not credible, persuasive and unequivocal and thus, respondent has failed to meet his burden of proof to establish psychiatric mitigation under *Braun.*

The remaining issue before this board is to determine the appropriate disciplinary sanction to be imposed upon respondent. Petitioner argues that a disbarment or a suspension for a greater amount of time than the 18 months recommended by the Hearing Committee is warranted. Respondent requests a stayed suspension and probation with monitoring. The board rejects both positions.

The appropriateness of a disciplinary sanction is based on the nature and gravity of the misconduct and the aggravating and mitigating factors present. *In re Anonymous No. 85 D.B. 97,* 44 D.&C.4th 299 (1999). This board has recognized, after review of many Pennsylvania Supreme Court opinions, that when an attorney engages in conversion of fiduciary funds, the discipline of suspension or disbarment will generally be imposed, the choice of which will depend on the mitigating or aggravating circumstances of the particular case. *In re Anonymous No. 132 D.B. 88,* 7 D.&C.4th 331 (1990) and *In re Anonymous No. 61 D.B. 92,* 19 D.&C.4th 494 (1993). In the instant case, this board finds that, unlike the lack of cooperation found in *Office of Disciplinary Counsel v. Monsour,* 549 Pa. 482, 701 A.2d 556 (1997) and the multiple and varying acts of misconduct found in *In re Anonymous Nos. 73 D.B. 83, 4 D.B. 84 and 41 D.B. 84,* 41 D.&C.3d 21 (1986), there are no aggravating circum-

stances warranting disbarment and the appropriate sanction for respondent would be a suspension.

A stayed suspension, as requested by respondent, would not be appropriate in this case. Respondent cites to three cases in support of his request; however, this board finds these cases to be inapplicable to this matter. In *In re Anonymous No. 28 D.B. 93,* (Pa. Sept. 9, 1996), a one-year stayed suspension, coupled with a two-year period of probation and financial and practice monitoring, was imposed after a finding of *Braun* mitigation. As noted above, this board does not find any *Braun* mitigation in the instant case and therefore rejects the application of the *In re Anonymous No. 28 D.B. 93* ruling to this case. As for the two remaining cited cases— *In re Anonymous No. 81 D.B. 90,* 15 D.&C.4th 254 (1992) and *In re Anonymous No. 111 D.B. 89,* 9 D.&C.4th 526 (1990)—neither raised psychiatric mitigation nor resulted in a stayed suspension, and moreover, the first case did not find conversion and the second case involved a significantly lesser amount of money converted; therefore, these two cases are not analogous to the instant case.

The length of suspension warranted is also dependent upon the existence of any aggravating and mitigating factors. In addition to citing *Monsour, supra* and *No. 73 D.B. 83, supra,* both of which this board finds inapplicable as the instant case is not a disbarment case, petitioner cites *In re Anonymous No. 62 D.B. 97,* 47 D.&C.4th 1 (1999), in support of its contention that a lengthy suspension—at least more than the 18-month suspension

recommended by the Hearing Committee, is warranted. The board finds that in *No. 62 D.B. 1997,* there were aggravating circumstances that are not found in the instant case. First, the attorney in that case was charged with not only commingling and converting fiduciary funds, but also neglect of matters and failure to communicate with clients. Respondent herein has not been charged with neglect or failure to communicate. Second, the attorney in that case failed to ever establish a trust account for client funds or maintain records of client funds; this is not the case with respondent. Finally, the attorney in that case had a history of three prior disciplinary actions. In the instant case, respondent has no record of prior discipline. He voluntarily testified at the hearing that he had received an informal admonition over 25 years ago. However, that record has been expunged since there have been no incidents since that time. Accordingly, this board finds that there are no aggravating circumstances in this case.

This board does find, however, that while *Braun* mitigation was not established, there are other mitigating factors in this case. First, as noted above, respondent in essence has no prior history of discipline. Second, he is extremely remorseful for his conduct. Third, he cooperated with petitioner in these proceedings. Fourth, while it is undisputed that respondent's delay in distributing all settlement proceeds was generally harmful to clients and/or third parties, respondent presented evidence that in most cases, the delay was caused by the need to negotiate and/or litigate bills of third-party medical care providers and/or liens of insurance carriers. Respondent has

already distributed or is currently in the process of distributing all remaining portions of settlement proceeds held by him. Finally, respondent began repaying the Abrams trust even before these proceedings were instituted against him and he made full restitution to the trust, including interest, by August 1999.

For the above reasons, the board concurs with the recommendation of the Hearing Committee and recommends a suspension of 18 months.

## RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania unanimously recommends that respondent be suspended from the practice of law for a period of 18 months.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter be paid by respondent.

## ORDER

And now, January 28, 2003, upon consideration of the report and recommendations of the Disciplinary Board dated November 7, 2002, it is hereby ordered that Ronald B. Abrams be and he is suspended from the bar of this Commonwealth for a period of 18 months followed by a two-year probation supervised by the Disciplinary Board pursuant to Rule 204(a)(4), Pa.R.D.E., and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.